Good morning. May it please the Court. My name is Maurice Baskin, representing the appellants. We're here on behalf of thousands of small business employers in Texas and their affiliates around the country who are challenging the most sweeping changes in the NLRB's election rules without an Act of Congress. Indeed, we say these changes violate the Acts of Congress, particularly the Taft-Hartley Act. Now, there's 25 different rule changes. We've focused our appeal on three categories, and we'll see how many of them we get to this morning. But the first one we want to focus on is the issue of the preclusion of employers from presenting evidence about voter eligibility in the mandatory pre-election hearing. This is a hearing that the board tried for years to move to after the election, but Taft-Hartley, they said, Congress came in and said it must be held before the election. It also rewrote the entire section dealing with the appropriate hearing. The board says there wasn't any change, but we provided the side-by-side. There are 89 words in the paragraph that are new, and only 14 that are the originals. That, I believe, is above 80 percent, are changed, and the words appropriate hearing even before Taft-Hartley were not interpreted to say that you can have a hearing at which you will not be heard, and that's what the board is saying now. They're saying on a question of representation, namely, who are the voters who are supposed to be represented that employers will not be allowed to present evidence, and they've relied on the Inland Empire case, and the district court relied on that case, but that case does not so hold. Indeed, it simply said that, first of all, at that time, didn't have to have a hearing at all, but the court said, well, when the hearing is held, there must be a full opportunity for the parties to present their objections. What do you make of this argument that there's nothing that requires the board to rule before the election, and so they can tinker with kind of how all this is done since the same diff, if you have the hearing but you don't get a ruling as if you don't have the hearing and don't have a ruling? Well, and it's not the same difference because as this court found in the Dickerson case, the case that the board has cited, there's quite a lot of value to having these hearings and making a record, which was new language that the Taft-Hartley Act put in there. Making the record helps to narrow the issues, and in the Dickerson case, there were a lot of supervisors in dispute. Many of them were found after the pre-election hearing to be resolved. Only a few of them were deferred. If the pre-election hearing had not been held and the evidence had not been presented, then nothing would have been narrowed. And so for the board to say, well, these are hard issues and they may be deferred and the parties will still have some uncertainty, that would be the, that is today the exception. They want to make it the rule. Regardless of when the decision is made? Regardless of. The hearing itself would narrow them. Right. And exactly. The hearing itself narrowed it, but that's because it allowed the decision to be made. Normally, once the hearing is held and evidence is presented, the regional director does make decisions. And that's what happened in Dickerson. And that's what happens in many, many cases. You're saying the pre-rule change flow was it was the exception for the ruling not to be made before the election. That's correct. Maybe there's some complex, weird situation, but ordinarily it'd shake out. We'd know who are the supervisors and who aren't and who's in the group and who isn't before the election is held. Exactly. And then that would, in turn, foster the ability of people to know, am I one of the gang that can talk in that world or am I part of management that has to obey those rules and that that's kind of critical to know who you are, voter or votee. Exactly. It is critical. It can't always be decided. At least the board has had this practice of sometimes the regions don't decide because maybe it's only a few people, and yet where there are groups of people that are presented to them, they routinely do decide, and it has value. And for the board to claim that it has no value is itself contrary to the act, contrary to the purpose that Congress went out of its way to ensure. Now, other than this confusion about is somebody essentially part of management or are they part of the potentially represented group, are there other things, are there other people who are affected by not knowing the answer to who's the unit? Yes, there are. In fact, in the cases that are being decided as we speak, there have been 1,800 now cases where this thing has been applied. There are all kinds of categories of workers who the regions are now deferring. They are not allowing consideration of them.  There are categories of types of workers as opposed to the supervisor, regular employee distinction. Yes. So it's like do I do the hammer and am I the one who goes to get the nail, those kinds of distinctions. Yes, there are. It's not limited to supervisors. Supervisors is one of the most important categories, not only because it affects what they can say or not say, but because Congress also amended the Taft-Hartley Act specifically to exclude supervisors, right at the same time that they're saying there must be a pre-election hearing. This is yet more evidence. And I just want to make one point. With all the briefing and this lengthy Mount Everest of regulation as described by the dissent, the board cites no case in which voter eligibility issues were found by the Supreme Court or by the board itself to be permitted to be deferred without a hearing, that were no case where they are doing what they're doing now. In the entire history of the Act, and that includes Taft-Hartley. Let me ask you this because they make a point about the facial versus as applied, and you've now said that there's these 1,800 elections that have taken place since the rule. Why wouldn't we wait for an as applied then to actually see how it transpired instead of the facial, which has this arguable problem of, you know, no set of circumstances and all that? For multiple reasons. First, under the Chevron test, you're not required. In fact, you're not supposed to wait. This is a challenge to the rule itself. It is causing harm on a daily basis 1,800 times already, and so the parties are harmed now. There is no discretion permitted by the Act, and so there is no set of circumstances in which this rule can be applied legally because by granting discretion to the regional directors, they're violating the plain language of the Act, not to mention the plain legislative history. The NLRB has cited no language which supports their position, and they have cited no legislative history which contradicts the conclusive statement of the father of the Taft-Hartley amendments, which was that the function of the hearings is to get evidence about the unit and the eligibility of voters to vote. Those are the questions of representation. The board has arbitrarily compartmentalized those to say, well, appropriate unit is a question of representation, but voter eligibility is not. What could be more fundamentally a question of representation than who is it that the union represents or claims to represent who is eligible to vote in the election? That, of course, is a question of representation. The board cited no authority for its rule that is part of this rule redefining the question of representation. Counsel, but are you referring to a statement made by Senator Taft, a single remark? Is that what you're going back to as far as, you know, if we're trying to ascertain the intended functions of the hearings, are we to really look at the remarks of a single legislator? Well, where the legislator is the sponsor, where they are, and not to mention the sponsor, widely recognized to be the controlling figure behind this whole legislation, where it was prepared remarks, a prepared statement, not a spontaneous statement, where it is uncontradicted by any other legislative history or any plain language, frankly. Under those circumstances, we cited multiple Supreme Court cases and a decision of this court that said, yes, you give weight to that, and why wouldn't you? This is what the sponsor of the law intended. It is the best expression of legislative intent. They cite one case in which the sponsor made a spontaneous remark that was contradicted by committee reports, a completely different situation. The sponsor's testimony is not the only thing to consider, but here they have presented nothing else. They presented nothing to contradict it, and the plain language, we start with that. That supports us. It says there has to be a hearing. If there's supposed to be a hearing, you have a right to be heard, and you can present evidence. Now, it's not a formal hearing. It doesn't have to be overly technical. For example, hearsay exceptions don't get involved in these kind of hearings. If that's all they were doing, we wouldn't be here. But they're saying you have no right to be heard at all. That is way overstepping their bounds. They have never held this before, and, in fact, the one time they considered the issue about 20 years ago, a board in which the members could barely speak to each other, it was not a collegial group at the time, they unanimously agreed that it was required by the statute and their own rules to allow it. Let me ask you this. We're starting to get out of time. You wanted to talk about the privacy issue, and I want to ask about the privacy issue too. Would a potential – well, is the absence of an opt-out provision what makes this arbitrary, or is it arbitrary anyway, even with an opt-out? If an employee could opt out and say, I don't want my personal e-mail and phone to be given, would that cure the problem, and is the absence of that the arbitrary, or is it simply any revelation of this technologically advanced information like phone numbers? Is that the problem? We believe opt-out would be better, but we didn't really advocate for opt-out. We believe it's arbitrary and wrong in evasion of privacy with or without an opt-out. Well, I'm not saying we could make the rule, but I'm asking that if that had been in the rule, would that avoid the arbitrariness and the privacy concerns that you raised? Because then the employees could protect themselves from unwanted advances, if you will, by the union, and unwanted sharing of their info. Right. Although it does impose some requirements on the employees, it would certainly have been an improvement, and the rejection of it, of that option, was itself arbitrary and capricious. It also would have been more consistent with the congressional expressions of intent in the other privacy laws that have been passed in the last 50 years. Well, I know, for example, I'm a member of the State Bar of Texas by license, and they have something you can opt out of, and when you give the information, you can check that box. So when you give them your e-mail address, you can check a box that says, I don't want my e-mail address publicly disclosed. So I could see employers going forward doing that. As they ask you for the information, having you check or not check a box about what you want. Right. That would be an improvement. But it still puts us in this situation of why is the board doing this? Section 7 is supposed to give employees the right to refrain from any support, and as part of now working, they are being told they have to provide this information to support unions. Section 7 is not passed to protect unions. It's passed to protect employees. Leachmere in the Supreme Court said there is that difference, and the board is saying we have to help the unions in order to let them communicate, and through a mechanism that is so intrusive when there are so many other mechanisms. You mentioned the opt out, but with social media now, the unions have more power than ever before to communicate their message. YouTube and Facebook and Twitter, all of these things that I haven't even gotten to the hang of yet. They're all there, and the unions have them, and they know how to use them. They are getting their message to employees more than ever before. So what is the need? Only if the employee looks at that website. They want the email. They want the home address. They want the telephone numbers. They want. They want. But what is their right to overcome the right of privacy of the employees that Congress itself has recognized? Is it not an option to use work, phone, and email because of the management overlay? You took the words right out of my mouth because the board has, separate from this rule, just issued a decision about a year ago, purple communications, in which they said that while the unions themselves can't automatically get access to the company email, any of their supporters is now guaranteed the right to use the company email to spread the message. So all the union has to do is give it to one of their supporters, and they're getting access now in the employer's property, somewhat controversial for other reasons. But, again, and this was pointed out by the dissent, what is your possible need to get at them at home? Okay. So then we are here to look, in essence, at the process as well as the result of the process. And one of the arguments to be made here is while they looked at these privacy concerns, they looked at the potential breaches, and they weighed all the evidence and came out the way we did, and we, the Fifth Circuit, should give deference to that. I'm wondering, did they look at this? Because it kind of seems like they go, well, yeah, we know that's a problem, but it hasn't been a problem in the past, which, of course, they haven't given this information in the past. So I'm wondering to what degree did they really scrutinize the potential problems of giving this and requiring this information to be given? In our view, they gave short shrift to these issues. They gave lip service to it, and I want to make a very important point about deference. They are entitled to no deference on the issue of electronic communications and in privacy of electronic communications on identity theft. The IRS, which we cited, says putting this information together cumulatively, adding on to the home addresses with the e-mails and phone numbers, is going to lead to an increased incidence of identity theft. So the Board is claiming deference throughout this proceeding, but they are entitled to no deference on that. Is that because they have no expertise in it? They have no expertise. I was going to say something about the Board's own internal processes, but I'll pass on that point. They are aware of them, as a layman is, but they are acting as if they know what they're doing and what the actual invasions of privacy are going to be. You're saying they made no effort to really find that out, nor did they have any expertise on it to begin with? Correct. Thank you. I'd like to reserve the rest of my time for the rebuttal. Thank you. All right, thank you. All right, Ms. Wagner. Might as well start with the privacy issue, because that seems to be the tail wagging the dog here. All righty. So the rule provides for two new disclosures of employee information. There's the initial list and there's the voter list. And what we've just heard Mr. Baskin really focus the privacy argument on is the second requirement, which is the voter list. The voter list is not a new requirement itself. It just requires additional employee contact information. So under the board's longstanding Excelsior rule, which was approved by the Supreme Court, employers within seven days of the direction of election had to provide the names and addresses of employees that were eligible to vote. And the rule updated that to now also require, in addition to home addresses, e-mail and phone contact information. Now the rule explains that this change was made to reflect the present realities of how employees and institutions communicate with one another. ABC doesn't really dispute that the modes of communication have drastically changed since Excelsior. And so the board found that in order to better advance Excelsior's purpose, which is to ensure or to maximize voter exposure to all sides, all viewpoints about union representation, it was necessary to update Excelsior to require employers to provide petitioning parties also available cell phone, e-mail, home phone number, contact information. And the board was sensitive to the privacy interests here. See, I'm not seeing this sensitivity. I'm just seeing that they go, well, yeah, it could be a problem, but we've told the unions not to misuse it, so that solves the problem. It's kind of an airy, dismissive attitude. I didn't really see an in-depth study of the kind of hacking and data breaches that we've seen even in the U.S. government can't protect their own employees' data and the pervasive problem of identity theft, which also didn't exist back in the Excelsior days. So where is this study, this extensive look at this? Point me to it. In terms of the identity theft argument, Your Honor, the board looked at that, but it wasn't really a complaint about the rule itself in providing the information to the union. It's about the fact that we're all, as you just mentioned, subject to heightened- But the more you put something out there, the more places I have to put my e-mail address, my this, my that, and the more that's linked to other stuff about me, the greater the risk. So it's already sitting in the employer's database. I agree, it's already at risk. Now you're going to give it a union who's going to give it to their third-party vendor who's going to make a pretty e-mail to send, who's going to give it to this, who's going to give it to that. And maybe they all intend a good use of it, but they're even more vulnerable to hacking and so forth than the employer. And the employee, who thought, I'm giving my cell phone so my employer can get a hold of me on a weekend if they need to, is suddenly exposed to all these other people they had no control over. And so the rule sets forth, Your Honor, that that would not be a permissible use of the employee contact information. The rule, the voter- What's that? So in the rule, the board said you can only use, first of all, the information's only given to the parties to the representation proceeding. And secondly, those parties are only allowed to use it in connection with the representation- Right, but now they have it. That's what you don't seem to understand, and what the board made no effort that I saw to examine. It's like they're thinking, well, if we tell everybody to behave themselves, they will. Well, no, I would point out here, Your Honor, that the board said that if there is misuse, and they find that there's misuse, and parties are using it for reasons that they're not supposed to, that it would- Okay, so let's wait until everybody gets hacked and has their identities stolen, and we have this whole disaster, and then we'll take a look at that. And this may be with the union not- I'm not saying the union itself is going to try to steal these identities, but that's the problem. We have these unscrupulous people even in other countries doing this. And so it seems to me the board made zero effort to look at that and examine that with any seriousness. They were very dismissive of that. And how can we give any credence to that or find that anything other than completely arbitrary to not at all consider a very real problem? Again, Your Honor, the board's position is it did consider the problem, but this problem is just part of our modern life. And the board couldn't put in place every safeguard to ensure that this wasn't going to happen. Why can't they give the employees an opt-out? Because they're making the decision that, well, this is part of life, so you're just going to have your e-mail address stolen. It's not me deciding I'm going to put my e-mail address out there for the world to see. It's you deciding to put my e-mail address out there. So that was a proposal that the board thoroughly considered in the rulemaking process. I do want to point out at the offset that ABC hasn't challenged that on appeal. That was raised by Miki, but it has not been challenged by ABC. The board looked at the practicalities of administering an opt-in and opt-out procedure. They found it would be administratively burdensome. It would also delay the conduct of election. Employees would have to have some length of time to decide. That would then have to be compiled, and the information would have to be provided to the petitioning party. And so that would – Why can't the opt-out be like it is for the State Bar of Texas? When I give them my e-mail address, I tell them I don't want it put on a public database. I don't want you to give it out. Check the box. Why can't that be done? And that doesn't take into account the significant Section 7 interest here that the board found in Excelsior and that was approved by the Supreme Court,  even if they're not initially predisposed – dispossessed to that position, because in order to make a fully informed choice, they need to hear all the sides. And so to allow for an opt-in or opt-out provision would, at the outset, be kind of completely contradictory to the purpose of Excelsior. You're trying to protect them from themselves? If they don't want this information, Section 7 is supposed to protect the employees. If they don't want – Let me ask you this. I think one of your positions was that, well, they've already given the home phone, they've given the private e-mail to the employer. Is that a condition of employment? What if they don't give the home phone? And the rule makes that clear, that it's only requiring available e-mails and phone contact information. So if an employee hasn't provided this information to the employer, the employer doesn't have to go out and obtain this information and provide it to the union. How do you explain Danbury, where apparently they felt like you didn't go deep enough? So if the employer being some big company doesn't have a database, doesn't have my home e-mail, but I've given it to my boss in the past because he needed to reach me on the weekend in case I needed to come in, Danbury seems to say you should have found that out because you, the employer, have it, because the boss had it even though big company X didn't have it sitting in their database, and they only have two days to figure this out. Well, Your Honor, it involved a situation where the employer was aware of there were multiple databases where employee contact information was being kept, and it only provided information from one of those databases. And the rule makes it clear that, yeah, it may be burdensome if this contact information is kept in multiple databases, and so it says that it's presumptively okay you can produce a list from each of the databases. And furthermore, the rule has an exception, so the employer, there's no indication that the employer went to the board in that case and said this is going to be very complicated and burdensome, and I'm going to need an extension of time. The decision there was just based on the employer's lack of. What do you do about the hypo I just gave? So you have a big company, you know, General Electric or somebody, who has a database, maybe two or three databases, but also has bosses in the individual offices who know their employees and have a cell phone and they say, hey, Katharina, what's your address? Let me put it in my cell phone, and now we have each other's cell phone number because we work together all the time. And now this thing comes out. Would that boss in that office, in the Dallas office, say, have to be consulted to look on his personal cell phone to see, does he have my personal cell phone number to give to the union? I mean, I'm not sure if the rule is completely clear on that, but it is supposed to be information that's maintained by the employer generally. So if it's just a supervisor who's kind of keeping it for his own purposes, I'm not sure that that would fall under the rule. I don't think you all have even thought through all of these ramifications. In the same world where we all have so much technology, you've got all of these issues that I don't think you know the answer to, and you're expecting these employers to figure this out in two days. Well, again, this is also a facial challenge, Your Honor, so it's ABC's burden to prove that in every set of circumstances. And in light of the fact that the voter list, the two-day deadline, is subject to an extension of time by the regional director, some of these issues, yeah, the board couldn't identify every potential issue that would come up in the future, but that's why they provided these exceptions for the various deadlines, so that the parties can inform the board of the problems and the board can allow for extensions of time. I'd like to move back to the pre-election hearing argument, or what ABC terms the preclusion argument. There was a statement made today that suggested that the board was taking away the right to a pre-election hearing. Under the amendments, there will always be a pre-election hearing unless the parties waive that hearing by entering into an election agreement. Who's making that decision? Because the rule says ordinarily, so who has the discretion to determine whether that's done pre-election or post-election? Doesn't it go to the regional directors to make that call? And I'm sorry, I'm not understanding the judge's question about whether or not there's a pre-election hearing. Right. There will always be a pre-election hearing. The only reason there wouldn't be a pre-election hearing is if the parties themselves have voluntarily entered into an election agreement. Parties enter into election agreements where they agree on the details of the election and the contours of the unit. So unless the parties enter into an election agreement, there will be a pre-election hearing. And I just do want to point out at the outset here, over 90% of the cases, election cases, are cases where the parties enter into these election agreements and where they agree on the details of the election, including the election date. But in any event, the dispute here really is about what must happen at the pre-election hearing if there is going to be a pre-election hearing. And ABC's position here is that if there's any disputes about who might be eligible to vote, that parties have to be able to put evidence on that in the record at the pre-election hearing. The problem with the argument is that nothing in the statute unambiguously requires the board to permit such litigation. And in fact, what ABC resorts to relying upon is the statement of Senator Taft, which was a single and isolated statement. You solve what sounds like a very real problem to me of how do I know if I'm a supervisor and employee in these situations where it's unclear. And so I don't even know if I can talk to my friend over here about the election as a fellow employee or whether I would be deemed to be management. That seems to be a rather big problem. Well, the board doesn't dispute that there's a complication when supervisory status is disputed, but this complication existed before the rule was in effect. And that's because as we go at- Why are you letting them try to resolve that? Well, I mean, Your Honor, another argument was made is that we aren't allowing parties to put forth evidence to narrow the issues. There were other amendments that were specifically made to address that. The statement of position, so that parties now have to file a formal written position on the various issues that they have with the election, including what their position is on eligibility to vote. And also, in addition, there's nothing that precludes a party in a particular case from litigating an eligibility dispute. The rule makes it very clear that it's the regional director's, the exercise of his discretion, he can determine whether or not he's going to allow litigation based on his judgment of what might be most administratively efficient. But also taking into account that these disputes can frequently be mooted by the results of the election because regional directors have always had the right to defer making the final determination on eligibility. So getting back to Your Honor's point, though, with respect to the supervisory status issue, because regional directors have never had to make a final determination on that, there's always been- Would you agree that it's generally they have made them? I mean, even though there may be the exception, but that generally speaking, those decisions have been made pre-election? I wouldn't say generally, Your Honor. We cited several cases in our brief where the board utilized a challenge ballot procedure to defer decisions on supervisory status, including that Dickerson- I mean, of the hundreds, thousands of disputes, how many were resolved pre-election before this rule changed, and how many weren't? There's no statistics on that in the rule, but even if a supervisory status determination was resolved prior to the election by the regional director, that decision is then subject to reversal by the board and the courts of appeal. And as this court held in Heights Funeral Home, even if we get a final board decision on supervisory status, that's not- there's no preclusive effect to that in a subsequent unfair labor practice case. And so if an employee is found to- or an individual is found to be an employee, and then later there's a subsequent ULP proceeding and the employee alleges, well, I was unlawfully discriminated, the employer is allowed in that subsequent ULP proceeding to relitigate the status, the supervisory status as a defense. So there's just- this uncertainty is something that's kind of inherent in the system. Parties have to act with their best judgment as to the supervisory status of individuals because there's so many levels of review here and opportunities for reversal. But this delay and this extension of time just seems so self-inflicted by the union. That these issues, who's a supervisor, whether a dispatcher's a supervisor, that's gone on for, what, eight years in the energy case? I mean, there's an inherent problem here in dealing with these issues that the employers need to have resolved, I would think, before the voting takes place. But again, Your Honor, as you point out, there can't be an ultimate resolution of it before the election takes place because the board can reverse the regional director's determination. And then as the energy case exhibits, that decision is then again subject to reversal by the courts of appeals. And I think it's important to point out here, 211 establishes or sets forth over 12 supervisory indicia, the possession of any of which one is enough to make one a supervisor. And so if this is really in dispute, there's just great opportunity for extensive litigation here that existed prior to the rule and the suggestion that, well, if we get a determination by the regional director at the pre-election hearing, this problem's going to go away, wouldn't resolve the problem because, again, of the levels of review that exist here. So I think relevant to the question about the scope of the pre-election hearing is the fact that the board, the board's challenge ballot procedure that I've alluded to, again, the board has utilized this challenge ballot procedure since the beginning days of the act. And what that means is that the regional director can defer deciding or making a final determination on eligibility prior to the election when it affects a relatively small percentage of the unit. There seems to be the suggestion here that the regional directors are just deferring like half of the unit, but that's not the case. The board didn't set a bright line rule about what can or cannot be deferred, but it did give regional directors discretion in going about exercising or guidance about going about exercising their discretion. And it was based on previous board and circuit court precedent. And board and circuit court precedent indicated that deferrals of up to 20 percent of the unit wouldn't necessarily result in the election being set aside. And so the rule just reasonably, in the rule, the board reasonably concluded if regional directors don't have to make a final determination on this pre-election hearing, then we don't need to have litigation of it. So we can resolve that for after the election to the post-election proceedings, and then we can resolve the status if necessary to certify the results of the election. But the regional directors then have full discretion to make these calls, correct? That's correct, Your Honor. And so, again, I just want to reiterate, we have a facial challenge here. It's ABC's burden to show that in no set of circumstances the rule could be lawfully applied. And because of this discretion, they can't show that in every case that the amendments unlawfully restrict the scope of the pre-election hearing. I want to, in my last moments here, just quickly address the timing issues. ABC suggests that the timing of the elections or that the changes have shortened the period between the filing of the petition to the election in a manner that's inconsistent with congressional intent. Again, here they're referring to the legislative history, because there's nothing in the text of the statute that says anything about a minimum period of time between the petition and the election. That legislative history is not persuasive for the reasons the Board explained in its brief. Basically, ABC is pointing to two statements made by legislators relating to a failed legislative proposal. What's the benefit of the change, then? Why was this change necessary? So, right, the Board did explicitly acknowledge that many of the amendments aren't targeting to timing, but it did find a particular problem in fully litigated cases. Again, that's the 10% of the cases where the parties can't enter into an election agreement. And the median period of time from petition to election in those cases was double what the time was in all other cases. And the Board looked at what were the sources of the delay in those cases, and the amendments were targeted at those sources of delay. And the biggest source of delay the Board found was this automatic 25-day stay that existed in its prior procedures. That provision isn't required by the statute. The Board looked at it and determined it wasn't serving its function, because the whole purpose of the 25-day stay was to give parties an opportunity to seek review of a regional director decision. They hardly were ever seeking review. The Board hardly was granting review. And so the Board decided to eliminate that procedure. And so any decrease here now that exists between petition and timing of election, it's not a surprise because the Board was targeting the sources of delay that existed in those 10% of fully litigated cases. Whose decision is it that it will be held at the earliest date practical? That, Your Honor, is the regional director's decision. A lot of shock. Yes. Well, that was the point of 3B, Your Honor, was to give the regional director's authority to conduct these representation elections so that the Board could expedite case processing. But the rule does put the election date, the setting of it, within the regional director's discretion. They're instructed to take into account case-by-case variables, such as the size of the unit, the geography, the industry, whether or not the employees are familiar with collective bargaining. And it also explicitly states that regional directors should take into account the party's desires, which would include their opportunity to campaign. And so because we're dealing with a facial challenge here, again, this amount of discretion effectively precludes the finding that in every set of circumstances, the amendments would unlawfully shorten the campaign period. I thank you very much, and we ask that you affirm the lower court. Thank you for your argument. Mr. Baskin. I guess I'll go in reverse order. Are you only dealing with the 10% that have been represented, that they can't reach an election agreement, as opposing counsel indicated? He said 90% reached this agreement. There are certain aspects of this rule that infringe on the agreements themselves. And I was, in fact, going to mention that there are now cases in which the regional directors are saying they will not approve an agreement that is more than a couple of weeks to have the election. That's the price now of entering into those agreements. Most of our focus has been on the contested cases, where the hearing is a big issue that we've been talking about. But the board's failure to set a minimum time and giving the regions this unbridled discretion to set a bare minimum, and now with elections being held in less than two weeks, the total average of all of them now going down from 39 days to 25 days, a dramatic drop. But that means there are some that are much less. And this gets us into this Reno discussion and the no set of circumstances. And while we have already said there are no set of circumstances that justify the rule on the points that we've been arguing against it, that Reno standard, there's no case in this court, and indeed I don't believe there is a case in which Reno has been applied and the no set of circumstances test has been applied to a rule that itself has been applied. But Reno was a rule that had no record. It was issued a week before the court issued its decision. The rule came out, and then the court acted. Before it had been enforced anywhere. Well, this is a rule that's been going on now for close to a year, and there is an ample public record of the things that are going wrong. And the reference was made to the Danbury case, and that's such a vivid example of what's wrong with this whole new voter list with all of this extra detailed information. So if we don't reverse the district court, what advice are you going to give clients who have to comply with this two-day rule in the scenarios I'm talking about where the home email may be known by somebody in, quote, management but isn't in the official, you know, HR database somewhere? How's that being handled in this ensuing year, and how would you advise your client to handle that? Well, it's interesting the comment that was made that it's supposed to be specifically held in some place or other. In fact, the statements being made by board officials, regional directors, even the general counsel have been the language is available. That's the word in the rule. If it's available to the employer, and what the regional director said in Danbury, I'm looking at this rule, it says available. Well, if it's anywhere in your database, anywhere in your manager's home iPhone or whatever, you're supposed to go find it. And in this case they said. . . It looks like discovery, and, you know, you're supposed to go and question everybody who might have knowledge of facts and gather their documents. Kind of back in our day when you'd go and you'd physically gather documents, it wasn't good enough to say, well, it's not in the HR file. You'd have to go to Joe Blow and go through his files and all of that. But you had more than two days, but, you know. Exactly, and it's, well, it's arbitrary and capricious is what it is because they did not consider all of the outcomes of what they put down in a very general sense, and then they poo-pooed the statements by those who said, we can't do it in two days. And plus, they have, you mentioned 10%. They have a rule that if the Excelsior list, the voter list, is off by 10%, if the addresses are wrong, not to mention now the e-mail addresses and the phone numbers, they can throw out the election for that. That is, in fact, their benchmark for throwing out an election over what used to just be the home addresses, and it's hard enough for employers to get those right. Now, with e-mails, with phone numbers, aside from the invasion of privacy, which is our primary complaint about this, we certainly complained about the arbitrariness of taking it down to two days with no, and having heard many comments in the record that this is impossible to get right. And so they're imposing this, not to mention the extra burden. And I will say one other thing. The board cites, accuses us of citing no case of abuse of these mailing lists. They cite no case in which the board has found the union did not have enough access to the employees under the current system. No case. The home address is plenty, and they have access to the employees as they come out of the workplace. They have their supporters inside the workplace who are communicating, and through the solicitation rules, have every right to communicate with their coworkers. The union can hold meetings. They have all the access they need. And now, in the age of social media, they can point to, go on this website, and we won't know, and nobody will know, the company won't know, and you can see on YouTube, you can see videos of how great we are, Twitter, and all the rest. They have so much ability to get through. Why do they need to intrude? The board said the risk is worth it. Well, ask Patricia Pelletier, who is the woman who was subjected to having to have all these magazine subscriptions come to her for thousands of dollars because she had the temerity to file a decertification petition. The unions, the comment was made, unions don't always behave themselves. And sometimes they actually believe civil disobedience is the way to go because they disagree with the limits that are put on them, and they want to make a statement. And the board has done nothing to protect this vital personal private information. It is arbitrary and capricious. You need to set it aside and vacate it. We ask that you do that. Thank you. Thank you, sir.